IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VANTON HICKS,                                    )
                                                 )
              Plaintiff,                         )
                                                 )
      -vs-                                        )
                                                   Civil Action No.  05-1740
                                                 )
THE TECH INDUSTRIES,                             )
                                                 )
              Defendant.                         )

AMBROSE, Chief District Judge.


OPINION and ORDER OF COURT

Plaintiff, Vanton Hicks ("Plaintiff"), initiated this action against his former employer, Defendant, The Tech Industries ("Defendant" or "The Techs"), alleging discriminatory treatment on the basis of race, age, and disability in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* ("PHRA").  Plaintiff also alleges that Defendant terminated his employment in retaliation for taking protected leave in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*. ("FMLA").

Pending before the Court are two motions for summary judgment.  Plaintiff has filed a Motion seeking summary judgment in his favor as to his FMLA claim. (Docket No. 27).  Defendant has filed a Motion seeking dismissal of Plaintiff's claims

in their entirety.  (Docket No. 31).  After careful consideration of the parties'
submissions and for the reasons set forth below, Plaintiff's Motion for Summary
Judgment is denied.  Defendant's Motion for Summary Judgment is granted in part
and denied in part.

I. <u>PROCEDURAL HISTORY</u>

For purposes of ruling upon the pending Motions, the following procedural
history is relevant.

After exhausting his administrative remedies, Plaintiff filed a Complaint
against Defendant on December 16, 2005.  (Docket No. 1).  Plaintiff moved to amend
his Complaint on June 21, 2006.   Leave was granted, and Plaintiff's Amended
Complaint was deemed filed on July 19, 2006.  (Docket Nos. 18, 23, 24).  Defendant
answered Plaintiff's Amended Complaint on August 2, 2006.  (Docket No. 25).

On October 11, 2006, Plaintiff filed his Motion for Summary Judgment, Brief
in Support, Concise Statement of Material Facts, and Appendix.  (Docket Nos. 27-30).
On November 17, 2006, Defendant filed a Counterstatement of Facts, Brief, and
Appendix in Opposition to Plaintiff's Motion.  (Docket Nos. 39-41).   Plaintiff filed a
Response to Defendant's Additional Statement of Facts in Opposition to Plaintiff's
Motion for Summary Judgment and Supplemental Appendix on December 1, 2006.
(Docket Nos. 45-46).  On October 11, 2006, Defendant filed its Motion for Summary
Judgment, Brief in Support, Concise Statement of Material Facts, and Appendix.
(Docket Nos. 31-35).  On November 17, 2006, Plaintiff filed a Brief in Response,
Responsive Concise Statement of Material Facts, and Appendix in opposition to

Defendant's Motion.  (Docket Nos. 42-44).  Defendant then filed a Response to Plaintiff's Additional Facts in Opposition to Defendant's Motion and a Second Supplemental Appendix of Record Evidence.  (Docket Nos. 47-48).

Both Motions are now ripe for my review.

## II.  MOTION FOR SUMMARY JUDGMENT

### A.  FACTUAL BACKGROUND

Unless otherwise indicated, the following material facts are undisputed.

### 1.  General Background

The Techs was created on July 1, 2001, when MetalTech, NexTech, and GalvTech, three related yet distinct entities in the galvanized steel industry, merged to create one company.  The operations in all three of the Techs' facilities, MetalTech, NexTech, and GalvTech, run 24 hours a day, seven days a week.

All three facilities utilize a four-team structure to run operations.  Each MetalTech team consists of one Team Leader, one Line Operator, one Entry End Operator, two Delivery End Operators, multiple Material Handlers, and two Maintenance Technicians, who collectively are referred to as Team Members.  The Team Leaders of each of the four teams report to a Plant Manager, and the Plant Manager reports to the Managing Partners.  Team Members work three consecutive days on twelve-hour shifts followed by three consecutive days off.  At the end of a twelve-hour shift, a second team relieves the first team, and also works a twelve-hour shift.  After three days, a third and fourth team will relieve the first two teams, giving the first and second teams three consecutive days off before returning to

3

relieve the third and fourth teams.  The parties agree that this team-based approach is dependent upon employees working together, making attendance and reliability essential parts of all operational employees' jobs.

    2.   Plaintiff's Employment History With The Techs

Plaintiff, an African-American male, was hired in March 1985 at MetalTech as a Material Handler, where his duties involved wrapping coils, operating the crane, writing up the paperwork for trucks, shipping, and looking up coils.  In 1989, Plaintiff was promoted to the position of Entry End Operator, where his duties consisted of operating various pieces of equipment in a safe and efficient manner, lining up and inspecting material, and recognizing and resolving equipment problems with other line personnel.  Plaintiff held the position of Entry End Operator until May 1997, when he was demoted back to a Material Handler position due to reliability issues. Plaintiff was promoted back to Entry End Operator in February 2001 by MetalTech Plant Manager, Dennis Pishney ("Pishney").  Plaintiff held the Entry End Operator position until his employment was terminated on March 30, 2005.

    3.   Plaintiff's Attendance and Health Issues

In 1990 and 1991 Plaintiff received three written warnings for not reporting to work as scheduled and/or excessive absenteeism.[1]  These warnings indicated that further absenteeism would result in disciplinary action including docking of pay and possible suspension and/or termination.  On Plaintiff's performance appraisal review

---

[1]  Unless otherwise noted, the documents cited herein are attached as exhibits to Plaintiff's deposition testimony.  See Docket No. 34, Def.'s App., Ex. 4 (Hicks Dep. Exs. 1-12, 14-15, 18, 22-24, 26, 28-29, 31-33).

form for 1990, he received a rating of "below expectations" in the category "Awareness of Company Objectives" due to his absenteeism.  The review indicated that Plaintiff must improve his absenteeism performance.

Plaintiff's 1991 performance recognition noted that Plaintiff "had interim reviews in 1991 concerning absenteeism" and that "improvement was seen in the last half of 1991."  The review further noted that "[c]ontinued improvement in 1992 is necessary."  Plaintiff's 1992 performance recognition indicated that he had missed a total of 208 hours of work and had not made any progress regarding his absenteeism.[2]  Plaintiff's 1993 review indicated that he missed 200 hours of work and had shown no improvement in absenteeism performance.

In October 1994, Plaintiff was notified that due to his past absenteeism levels, he would not be paid for further absences and must work as scheduled with no allowance for turn trades.  This action is called being placed on the "D List" (or "Docked Time List"), and is punishment for poor job performance, including absenteeism. Plaintiff's 1994 performance recognition indicated that he missed 133 hours of work in 1994 and instructed him to continue to improve his reliability in his attendance.  Plaintiff's 1995 review instructed him to continue good attendance for work shifts and meetings and to avoid last minute vacation days.  Plaintiff received

---

[2]  Plaintiff admits that his 1992 Performance recognition indicates that he missed 208 hours of work.  He denies, however, the accuracy of this hours estimate, claiming that Defendant's attendance records are unreliable and the original time records are unavailable for inspection.  Pl. Resp. St. Facts at 4.  Unless otherwise noted, Plaintiff makes the same objection as to each estimate of hours missed set forth in his subsequent performance reviews.  Although Plaintiff points out specific alleged discrepancies in Defendant's records concerning other employees' attendance, he does not indicate what he believes to be an "accurate" estimate of his absences.  See Pl. Resp. St. Facts ¶ 12.

a written notice in 1996 informing him that he would be removed from the D List on March 1, 1996; the notice also warned Plaintiff that further absenteeism abuse would result in disciplinary action to include suspension and/or termination.

Plaintiff's 1996 performance recognition indicated that he had missed 66.5 hours of work and had not avoided last minute vacation-day scheduling when possible.  On May 21, 1997, Plaintiff was given an interim performance review detailing absenteeism and reliability weaknesses.  The review notes that Plaintiff "has indicated that recent personal issues have him somewhat distracted and he himself is concerned about his reliability."  Plaintiff agreed that he was not performing his job well due to personal problems.  Hicks Dep. at 21-23.[3]  Defendant demoted Plaintiff to a Material Handler I position effective May 25, 1997.  Id.

Plaintiff's 1997 performance recognition recognized him for putting his reliability issues behind by attending all safety and quality meetings.  The review also instructed him to keep absenteeism down, attend meetings, and avoid last minute vacation delays.  Plaintiff's 1999 performance recognition instructed him to maintain his attendance performance.

From July 10, 2000 through October 10, 2000, Plaintiff was placed on salary continuance for health reasons.  Salary continuance is a benefit Defendant offers that provides employees with paid leaves of absence up to and including 100% of

---

[3]  Plaintiff avers, however, that he nevertheless felt he was being singled out for demotion. Pl. Resp. St. Facts. ¶ 24.

their base monthly salary for six months, depending on years of service.[4]

In November 2000, Pishney became the Plant Manager of the MetalTech facility. On his performance recognition for 2000, Plaintiff was rated as "proficient" under "Work Style and Attendance Punctuality," and Pishney noted that although Plaintiff "has a lot of hours missed last year, they are due to the fact he was taking care of some health problems." On February 19, 2001, Pishney promoted Plaintiff back to Entry End Operator. Pishney instructed Plaintiff at the time of this promotion that he must continue to maintain his attendance and performance. A file memorandum dated April 25, 2001 indicates that Pishney met with Plaintiff in April 2001 regarding two instances of tardiness. The memo states that Pishney informed Plaintiff of the company's expectations and that he would be subject to further discipline if his performance did not improve.

Pishney avers that in August 2001, he received an e-mail from a Team Leader stating that Plaintiff had arrived late a few nights earlier; that Plaintiff had called to say he would be late again; and that Walt Laney, an African American older than Plaintiff, was outraged that Defendant let Plaintiff "get away with this kind of stuff." Docket Nos. 34, Ex. 2; 35, Ex. 1. Pishney met with Plaintiff regarding tardiness problems, suspended him for two days without pay, and warned Plaintiff that he would be subject to further discipline if his performance did not improve.

Plaintiff's 2001 performance recognition rated him as "needs development"

---

[4] The record also indicates that Plaintiff was on salary continuance for two weeks in May 2000. Some of his health problems in 2000 were related to gastric bypass surgery.

under "Work Style/Punctuality," and Pishney noted that Plaintiff had missed 90 hours of work.  The review indicates that some of the hours Plaintiff missed were due to health problems.  Plaintiff admits that he was placed on salary continuance for 56 hours in October 2001.  Defendant's attendance charts indicate that Plaintiff missed an additional 90 hours of sick leave and 27 hours of unpaid personal leave in 2001. Docket No. 34, App. Ex. 13.

On September 5, 2002, Plaintiff received a memo from a managing partner stating that he had a pattern of not attending team meetings.  On November 19, 2002, Pishney met with Plaintiff to inform him that he was not meeting the company's attendance expectations, tell him to improve his performance, and warn him that if his attendance did not improve, he would be subject to further disciplinary action.   Plaintiff's 2002 performance recognition rated him as "unsatisfactory" for "attendance/punctuality" and indicated that he missed 109 hours of work for sick and personal leave and that his "poor attendance continues."

Beginning in late-April 2003, Plaintiff was absent from work due to a blood clot and related treatment.  Plaintiff returned to work on June 3, 2003, but was rushed from work to the hospital on June 9 for lightheadedness.  On June 11 2003, Plaintiff informed Defendant that he was diagnosed with colon cancer and would be unable to work for a minimum of 10-12 weeks.  Plaintiff was off work from June 2003 to April 2004 to undergo cancer surgery and chemotherapy.  From June until October 2003, Defendant placed Plaintiff on salary continuance, which allowed him paid time off during his treatment.  Defendant then placed Plaintiff on long-term

disability leave and held his job open until he was capable of returning to work. Plaintiff first attempted to return to work on April 5, 2004 after his doctor, John A. Lech, released him to return at full duty.  Defendant warned Plaintiff about his attendance and returned him to long-term disability status after he was late to work, was a no call/no show, and/or called in sick on four occasions in April and early-May 2004.  Plaintiff testified that he had tried to return to work too quickly.  Dr. Lech again released Plaintiff to return to work on May 24, 2004, and he returned to full-duty work in his prior position of Entry End Operator that day.  Both Plaintiff and Dr. Lech testified that, upon Plaintiff's return to work, his colon cancer did not limit his ability to perform daily life activities.

Plaintiff received an overall "meets expectations" rating on his performance recognition dated September 19, 2004.  On the written review form, Plaintiff commented "Totally agree with assessment.  Haven't missed a meeting since returning.  I appreciate the patience my Team Members have shown me after my bumpy start, but everything is fine now."

A MetalTech file memo dated January 17, 2005 indicates that Pishney held a meeting with Plaintiff on that date regarding his 2004 attendance.  The memo states that Plaintiff missed 60 hours on sick leave in 2004 and that Pishney believed Plaintiff's 2004 attendance issues were isolated incidents related to Plaintiff's health.  Another file memo dated February 17, 2005 indicates that Pishney and Team Leader Roy Thomas met with Plaintiff the previous day regarding an incident with Plaintiff either reporting off or reporting to be late for work.

9

On March 30, 2005, Defendant informed Plaintiff that it had decided to terminate his employment due to his unreliability.  Defendant states that Pishney and Managing Partner Peter Stringi were the decisionmakers.  Pishney avers that his decision to terminate Plaintiff's employment was based on his personal knowledge of Plaintiff's attendance problems and unreliability from November 2000 through March 2005, and Stringi maintains that his decision was based on Plaintiff's entire 20-year attendance and disciplinary record at MetalTech.  Plaintiff denies that these are the true reasons for his discharge and that the real reason was discriminatory animus.  Plaintiff was 50 years old at the time of his discharge.  Following Plaintiff's discharge, Defendant promoted Material Handler Rob Voelker, a white male two years younger than Plaintiff, to Plaintiff's former Entry End Operator position.

B.  <u>LEGAL ANALYSIS</u>

   1.  <u>Standard of Review</u>

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, this Court must examine the

facts in a light most favorable to the party opposing the motion.  Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact.  Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987).   The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law.  Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  Celotex, 477 U.S. at 322.  Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial.  Id. at 324.  Summary judgment must therefore be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988) (quoting Celotex, 477 U.S. at 322).

   2.  Age Discrimination Under the ADEA and PHRA (Counts I, IV)

        The ADEA provides that "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges or employment because of such individual's age."  29 U.S.C. § 623(a).[5]  In this case, both parties agree that I should analyze Plaintiff's ADEA claim using the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under that framework, plaintiff first must establish a *prima facie* case of discrimination.  If the plaintiff succeeds, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  If the defendant meets this minimal burden, then the plaintiff must prove, by a preponderance of the evidence, that the articulated reason was mere pretext for discrimination.  Id. at 802; Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).  Throughout this analysis, however, the burden of proving intentional discrimination rests with the plaintiff.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

In order to establish a *prima facie* case of age discrimination under the ADEA, a plaintiff must demonstrate that:  (1) he is over forty; (2) he is qualified for the position in question; (3) he suffered an adverse employment decision; and (4) his replacement was sufficiently younger to permit a reasonable inference of age discrimination.  Hill v. Borough of Kutztown, 455 F.3d 225, 247 (3d Cir. 2006) (citing Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir. 2004)); Taylor v. West Penn Allegheny Gen. Hosp., No. Civ. A. 04-1564, 2005 WL 3113187, at *2 (W.D. Pa. Nov.

---

[5]  My analysis of Plaintiff's ADEA, Title VII, and ADA claims apply equally to his age, race, and disability discrimination claims under the PHRA.  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

21, 2005).  In this case, Defendant argues that summary judgment on Plaintiff's ADEA claim is appropriate because Plaintiff cannot satisfy the fourth prong of the *prima facie* case.  I agree.

The parties do not dispute that Plaintiff was 50 years old when his employment was terminated and that his replacement, Rob Voelker, was only two years younger.  Although there is no bright-line rule as to what constitutes a "sufficient" age difference, this two-year difference alone is simply too insignificant to raise a reasonable inference of age discrimination.  See, e.g., Narin v. Lower Merion Sch. Dist., 206 F.3d 323, 333 n.9 (3d Cir. 2000) (55-year old could not establish discrimination where positions sought were filled by 49- and 54-year old); Bernard v. Bethenergy Mines, Inc., 837 F. Supp. 714, 717 (W.D. Pa. 1993) (seven- and four-year differences), aff'd, 31 F.3d 1170 (3d Cir. 1994); Hill v. Bethlehem Steel Corp., 729 F. Supp. 1071, 1074 n.5 (E.D. Pa. 1989) (six- and three-year differences), aff'd, 902 F.2d 1560 (3d Cir. 1990); Kehres v. Kline, No. Civ. A. 03-6108 , 2004 WL 2812047, at *8 (E.D. Pa. Dec. 7, 2004) (two-year difference), aff'd 132 F. App'x 992 (3d Cir. 2005); Taylor, 2005 WL 3113187; Jehling v. Mellon Bank, N.A., No. 05CV1174, 2006 WL 1508963, at *6 (W.D. Pa. May 31, 2006); see also O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996) (a reasonable inference of age discrimination "cannot be drawn from the replacement of one worker with another insignificantly younger").

Plaintiff does not dispute that his replacement was insufficiently younger to create an inference of age discrimination.  Rather, he contends that he "need not present sufficient proof that he was replaced by a sufficiently younger person" to

create such an inference.  Pl.'s Opp. at 1-2 (quoting <u>Roach v. Am. Radio Sys. Corp.</u>, 80 F. Supp. 2d 530, 532 (W.D. Pa. 1999)).  Instead, according to Plaintiff, <u>any</u> evidence adequate to create an inference of age discrimination will suffice, regardless of the age of his replacement.  <u>See id.</u>

Although I recognize that the fourth prong of the *prima facie* case is not entirely rigid, <u>see</u>, <u>e.g.</u>, <u>Fasold v. Justice</u>, 409 F.3d 178, 185 n.10 (3d Cir. 2005), I find no reason to deviate from that element in this ordinary discharge case.  As an initial matter, I note that the Third Circuit opinions articulating the ADEA *prima facie* case in the unlawful discharge context routinely include the "sufficiently younger" element as the fourth prong of the test.  <u>See</u>, <u>e.g.</u>, <u>Hill</u>, 455 F.3d at 247; <u>Potence</u>, 357 F.3d at 370; <u>Winter v. Cycam/Medsource Techs.</u>, 166 F. App'x 593, 595 (3d Cir. 2006) (*per curiam*).  As also set forth above, courts routinely enter judgment in favor of employers in such cases where this prong is not met.  Moreover, even if it is appropriate to consider additional evidence of age discrimination despite the insignificant age difference between Plaintiff and his replacement, Plaintiff has not offered any such evidence in this case.[6]  Although Plaintiff claims that such evidence "abounds," the examples to which he points are unpersuasive.

For example, Plaintiff first cites to his own deposition testimony that Defendant "sought to terminate him because of his age" and was "going to get rid

---

[6] For this reason, this Court's decision in <u>Roach</u>, to which Plaintiff cites in his opposition brief, is not helpful under the facts of this case.  Although, in <u>Roach</u>, I denied defendant's motion for summary judgment in an ADEA case even though the plaintiff's replacements were not substantially younger, the plaintiff in that case presented significant other evidence that his age nevertheless played a role in his discharge.  <u>See Roach</u>, 80 F. Supp. 2d at 532-33.  Plaintiff has offered no such evidence in this case.

of him because of his age and risk for future illness." Opp. Br. at 2. He points further to his "belief" that he was "being singled out and scrutinized more carefully than other employees." Id. Simply because Plaintiff says he was discriminated against, however, does not make it so. See Jackson v. Bob Evans-Columbus, No. 2:04cv559, 2006 WL 3814099, at *7 (W.D. Pa. Dec. 22, 2006) (citing cases and stating that "unsupported/conclusory allegations of discrimination are not sufficient at the summary judgment stage to create a triable issue of fact"). Indeed, when asked at his deposition what evidence he had to support his belief that Defendant discriminated against him on the basis of age, Plaintiff agreed that it was just speculation on his part. Hicks Dep. at 130. Speculation is simply not evidence of discrimination. See Billet v. CIGNA Corp., 940 F.2d 812, 816 (3d Cir. 1991) ("Merely reciting that [discrimination] was the reason for the decision does not make it so.").

Plaintiff next argues that Defendant's decision to replace him with Rob Voelker creates an inference of age discrimination, despite the fact that Voelker is only two years younger than Plaintiff, because Voelker had a worse attendance record than Plaintiff in the last ten months of Plaintiff's employment with Defendant. Pl.'s Opp. at 2-3. Presumably, Plaintiff's theory is that it does not make sense that Defendant would have discharged him for attendance issues and then replaced him with someone with worse attendance issues. Therefore, the true reason for Plaintiff's dismissal must have been his age. I disagree. As an initial matter, Defendant does not contend that it discharged Plaintiff solely because of his attendance during the last ten months of his employment. Rather, Defendant

points to Plaintiff's history of absenteeism during his career at the Techs (or at least as back as far as 2000). Plaintiff has not offered any evidence regarding the nature of Voelker's absences or that Voelker had a similar long-term history of attendance issues or otherwise was similarly-situated to Plaintiff. Furthermore, Plaintiff neglects to mention that Defendant terminated the employment of five other employees within a comparable time frame for attendance and reliability issues, four of whom were significantly younger than Plaintiff.[7]

Finally, Plaintiff argues that "age-related" comments in certain other employees' performance reviews create an inference that age was a factor in Plaintiff's discharge. Specifically, Plaintiff points to: (1) a comment from Pishney in Brian Foster's 2002 evaluation that "I would like to have more young men like Brian on the team"; (2) a comment in Walter Laney's 2001 review that "Walt is now 60 years young and nearing retirement. I hope he can hang in there for a few more years"; (3) a comment in Howard Lehman's 2003 review to "keep up the good work and watch out for the younger crew members and keep safety your No. 1 priority"; and (4) a comment in Bryan Murphy's 2002 review that "Brian is very close to an above standard with being a smart young man." Pl.'s Opp. at 3-4 (and accompanying record cites). Plaintiff argues that these comments contravene Defendant's policies mandating the removal of "any bias and non-job related considerations" from

---

[7] Specifically, Defendant terminated Brian Foster (age 26), Mike Logan (age 25), Pat Racko (age 29), and Ron Stovash (age 31). Defendant also discharged Ed Krakowiak (age 57). See Def.'s Br. at 14-15 (listing record cites). Also of note, one of the two employees Plaintiff cites in support of his race discrimination claim as having had similar attendance issues yet was not discharged, Sonny Rozik, was <u>older</u> than Plaintiff. <u>See id.</u>

employee evaluations and, thus, are evidence of a pattern of age discrimination in Defendant's employment decisions.

This argument is meritless.  As an initial matter, none of these comments relate in any way to Plaintiff or Plaintiff's job performance.  Plaintiff has not pointed to any comments related to his own age contained in any of his numerous performance evaluations or elsewhere.  Moreover, there is no evidence that any of the individuals about whom the comments were made were discriminated against or, in the case of younger employees, given preferential treatment because of their age.  Even if age (and not experience) related, the comments regarding the two older employees, Laney and Lehman, appear complimentary, or at the very least, neutral and benign.  Both of these individuals received "above standard" ratings on their reviews.  The record evidence further indicates that one of the younger individuals, Brian Foster (age 26), was put on the "D" list and terminated less than two months after the above evaluation for the same articulated reason (attendance and reliability) as Plaintiff.  See Docket No. 34, Exs. 2, 3.  In short, none of the stray comments to which Plaintiff refers reflects age bias or discrimination at all, let alone in Plaintiff's specific case.[8]

In short, Plaintiff has not pointed to any evidence whatsoever upon which a

---

[8] Plaintiff's citation to Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1423 (3d Cir. 1991),  for the proposition that "an employer's failure to follow its own policies can constitute evidence with an intent to discriminate," Pl.'s Br. at 4, is misplaced.  In Colgan, the issue was whether or not the employer followed a specific company policy with respect to the plaintiff's own atypically negative performance evaluation.  935 F.2d at 1422-23.  Here, Plaintiff does not point to any evidence of age-related comments or bias in his own performance evaluations, and the few stray comments to which he points in other employees' evaluations are not suggestive of a general age bias on the part of Defendant, let alone discrimination against Plaintiff.

reasonable jury could conclude that age played any role in Defendant's decision to terminate his employment.[9]   Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's ADEA claim is granted.[10]

3.   Race Discrimination Under Title VII and the PHRA (Counts II, IV)

Both parties agree that I should analyze Plaintiff's race discrimination claim using the McDonnell Douglas burden-shifting framework outlined in Section II.B.2, supra.  In order to show a prima facie case of racial discrimination under Title VII and the PHRA, a plaintiff must illustrate that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably, or that the circumstances of his termination give rise to an inference of discrimination. See Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410-11 (3d Cir.1999).

Here, Defendant does not argue that Plaintiff has failed to establish a prima facie case of race discrimination, presumably because it is undisputed that Plaintiff's replacement, Rob Voelker, was white.  Defendant contends, however, that Plaintiff's

---

[9]   I also note that the three individuals Plaintiff accuses of age discrimination, Pishney, Pete Stringi, and Roy Thomas are either older than or, in the case of Thomas, the same age as, Plaintiff. Although not dispositive, this fact further supports Defendant's contention that it did not discriminate against Plaintiff on the basis of age, especially given the lack of other evidence to the contrary.  See, e.g., Richter v. Hook-SupeRx, Inc., 142 F.3d 1024, 1032 (7th Cir. 1998).

[10]Even if Plaintiff had established a prima facie case of age discrimination, which he did not, Defendant has articulated a legitimate, nondiscriminatory reason for terminating his employment – ongoing attendance and reliability problems.  For the same reasons set forth above, Plaintiff has not pointed to any record evidence showing that his age had anything to do with his discharge, let alone evidence that Defendant's articulated reason for the discharge was a pretext for age discrimination.  See also Secton II.B.3, infra.

race discrimination claim cannot survive summary judgment because it has provided a legitimate, nondiscriminatory reason for its decision to terminate Plaintiff's employment and Plaintiff cannot point to any record evidence showing that this reason was a pretext for race discrimination.  I agree.

As an initial matter, Defendant easily has satisfied its minimal burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff's employment – ongoing attendance and reliability problems.  See, e.g., Barclay v. Amtrak, 435 F. Supp. 2d 438, 445 (E.D. Pa. 2006) (absenteeism); Vilchock v. Procter & Gamble Paper Prods. Co., 868 F. Supp. 659, 665 (M.D. Pa. 1993) (reliability).  In this regard, Defendant has pointed to significant record evidence, including written warnings and performance evaluations as well as Plaintiff's own admissions, documenting Plaintiff's absences and other reliability issues throughout his employment with the Techs.  Accordingly, the burden is on Plaintiff to offer evidence that this proffered reason is pretextual.

In order to show pretext, a plaintiff must submit evidence from which a reasonable jury could either: (1) disbelieve the employer's articulated legitimate reasons; or (2) conclude that discrimination was more likely than not a motivating or determinative cause of the employee's discharge.  See Fuentes, 32 F.3d at 762. As the Court of Appeals for the Third Circuit has explained,

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.  Rather, the non-moving plaintiff

> must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

Id. (internal quotation marks and citations omitted); see also Keller, 130 F.3d at 1109 ("[T]he plaintiff must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."); Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (plaintiffs must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision"). The burden of proving pretext is a difficult one, Fuentes, 32 F.3d at 765, and one which Plaintiff has failed to meet in this case.

As an initial matter, Plaintiff admits that he had attendance issues throughout much of his career with Defendant and that Defendant had instructed him on a number of occasions that it was not satisfied with his attendance performance. Further, when asked at his deposition what evidence he had to support his claim that Defendant "wanted to get rid of [him] because of [his] race," Plaintiff responded "[i]t is speculation."  Hicks Dep. at 122.  As previously discussed, speculation or one's subjective belief is simply insufficient to support a Title VII claim.

In an effort to overcome these admissions and demonstrate pretext, Plaintiff argues that Defendant gives three contradictory explanations for terminating his employment, thus showing "inconsistencies, incoherencies, and contradictions" in Defendant's articulated reason.  According to Plaintiff, the three "contradictory" reasons are as follows: (1) Stringi testified (and Defendant's Answer to Plaintiff's

20

Complaint stated) that Plaintiff was terminated "because he was not dependable or reliable due to his attendance problems."  Pl.'s Br. at 5 (citing Stringi Dep. 8/8/06 at 69; Stringi Dep. 7/11/06 at 24-25); (2) Stringi testified as Defendant's 30(b)(6) witness that Plaintiff's employment was terminated for his unreliability over his career, including any and all time taken off during his entire career, showing up late for work, and abuse of the vacation time process.  Id. at 5-6 (citing Stringi Dep. 8/8/06 at 95-97, 101-03 & Ex. 9); and (3) Pishney testified that Plaintiff was discharged for tardiness and absenteeism for the time period of November 2000 (the date Pishney became Plaintiff's Team Leader) through 2005  with the exception of time taken for salary continuance in October 2001, April-October 2003, and for long-term disability from October 2003-May 2004.  Id. at 6 (citing Pishney Dep. at 114-17, 119-24 & Ex. 4).

        This argument is without merit.  Significantly, I fail to see how these "three" explanations are contradictory.  To the contrary, all of the above examples relate to the same issue – Plaintiff's unreliability due to attendance problems.  Even Plaintiff states elsewhere in his opposition that "[w]hile the Defendant has given at least three contradictory reasons for terminating the employment of Hicks, *each apparently depends on the assumption that Hicks' work attendance was poor.*"  Pl.'s Opp. at 9.  The fact that Pishney and Stringi's testimony as to the exact period of Plaintiff's employment that was considered in making the termination decision may have differed does not change the fact that the reason for Plaintiff's discharge was

the same – his unreliability due to some combination of attendance issues.[11]  It is likewise not contradictory that Pishney and Stringi use the terms "reliability" and "tardiness" in addition to or interchangeably with "attendance."   As Stringi reasonably explained in his deposition testimony, "[u]reliable includes attendance. . . . [U]nreliability is the umbrella under which absenteeism falls."  Stringi 8/8/06 Dep. at 95.  In addition, Defendant has never contended that Plaintiff's attendance problems only related to absences.  It is far from unreasonable or contradictory to consider tardiness an attendance problem or to describe an employee with tardiness issues as unreliable.[12]  Because this "evidence" does not contradict the core facts put forward by Defendant as the legitimate reason for its decision, it is not evidence of pretext.  Kautz, 412 F.3d at 467; Fuentes, 32 F.3d at 762.

Plaintiff also argues that Defendant's articulated reason is incoherent because Plaintiff's attendance "improved dramatically" during the last ten months of his employment.  Pl.'s Opp. at 9.  He contends that his attendance record during this ten-month time period was better than at least fourteen other allegedly "similarly-

---

[11]  While the exact absences Defendant considered may be relevant for various reasons with respect to Plaintiff's ADA and FMLA claims discussed infra, it is not evidence of pretext in connection with Plaintiff's race and age discrimination claims.

[12]  Plaintiff also argues that the explanation that he was terminated in part for tardiness is "particularly suspect" because his direct supervisor, Roy Thomas, felt that Plaintif was punctual and had no problems with Plaintiff reporting to work on time.  Pl.'s Opp. at 6.  This argument is unavailing.  The deposition testimony to which Plaintiff cites relates solely to comments Thomas made on Plaintiff's April 2003 performance review.  Thomas Dep. at 67; Hicks Dep. Ex. 28.  It is not evidence that Plaintiff never had issues with tardiness during his career with Defendant.  Moreover, the record is replete with other documentation of tardiness issues.  See, e.g., Hicks Dep. Exs. 21, 22, 23 & 29 (4/22/01, 4/25/01, 8/28/01 and 5/5/04 Pishney memos regarding Plaintiff's tardiness); 26 (9/5/02 memo regarding Plaintiff's failure to attend team meetings).  Indeed, in August 2001, Plaintiff was given two days off without pay due to repeated tardiness.  Id. Ex. 23.

situated" employees and equal to one other.  Id. at 9-10.  Even if true, however, these facts do not cast doubt on Defendant's articulated reason for Plaintiff's discharge – his ongoing attendance problems throughout, at the very least, the last five years of his career.  Defendant has never contended that it discharged Plaintiff based simply on his attendance over the last ten months of his employment, and Plaintiff does not dispute that his prior attendance issues were significant.[13]  For similar reasons, the attendance of the other fifteen employees to whom Plaintiff points over those same ten months is irrelevant.  Not only does Plaintiff fail to point to any evidence to show that these individuals were indeed similarly-situated, he does not provide any evidence that they had long-term attendance problems similar to Plaintiff's.  In addition, Plaintiff neglects to mention that Defendant terminated the employment of five other white employees within a comparable time frame for attendance and reliability issues.[14]

For these same reasons, Plaintiff's more specific argument that two allegedly similarly situated white employees, Joseph Peterman and Sonny Rozik, whom he claims had similar or more egregious attendance and/or reliability issues but were retained, is without merit.  Pl.'s Opp. at 13-14.  It is well-settled that a plaintiff cannot pick and choose his comparators or selectively point to a comparator as evidence of unlawful discrimination.  See Simpson v. Kay Jewelers, 142 F.3d 639, 646-47 (3d Cir. 1998); Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 359 (3d Cir. 1999).  Although

---

[13]  Plaintiff also admits missing 24 hours of work in the last ten months of his employment.

[14]  Specifically, Defendant terminated Brian Foster, Mike Logan, Pat Racko, Ron Stovash, and Ed Krakowiak, all of whom were white.  See Def.'s Br. at 14-15 (with cites).

Peterman and Rozik were not discharged, the totality of the record evidence regarding the employees Defendant did terminate for attendance and reliability issues is not suggestive of race discrimination.

Plaintiff next argues that Defendant's reasons are pretextual because the company failed to follow its own policies in evaluating him.  Pl. Opp. at 7-8.  Specifically, Plaintiff points to his performance review dated April 2003 which he claims was not signed by the Plant Manager, Pishney, as required by company policy.  He also points to Pishney's deposition testimony that Pishney was not present for the review due to illness and was uncertain whether he had any input in the review.  See id.  Plaintiff finally notes that he himself never signed the review and that his team leader was unsure if he went over the recognition with him.  Id.  Even if true, however, Plaintiff fails to explain how these alleged failures to follow policy with respect to his 2003 performance review are indicative of race discrimination or cast doubt on Defendant's articulated reasons for terminating Plaintiff's employment.[15]

Finally, Plaintiff argues that an intent to discriminate is evident because Defendant failed to provide an objective basis for its personnel decisions.  In support, Plaintiff points primarily to the fact that the Techs has no set number of

---

[15]  Again, Colgan, 935 F.2d 1407, does not help Plaintiff's case.  In Colgan, the issue was whether or not the employer followed a specific company policy with respect to the plaintiff's own atypically negative performance evaluation.  935 F.2d at 1422-23.  Here, the review at issue was not "atypically negative."  Rather, Plaintiff's review was consistent with numerous prior reviews criticizing his admitted attendance issues.  Further, the review at issue does not appear to be Plaintiff's final review from Defendant.  Rather, the record contains a copy of a subsequent review dated and signed in September 2004 by both Plaintiff and Pishney.  Hicks Dep. Ex. 31 (Docket No. 34).

absences that merits termination.  Pl. Opp. at 8.[16]  This simply is not evidence of racial discrimination or pretext.  The law does not require employers to set a specific number of absences that will trigger termination of an employee, and Defendant's failure to do so does not mean that Defendant's articulated reason for Plaintiff's termination is unobjective or indicative of pretext.  See Keller, 130 F.2d at 1101 ("The question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [discrimination].") Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 332 (3d Cir. 1995) ("[A]n employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason.  [W]e do not sit as a super-personnel department that reexamines an entity's business decisions."). Furthermore, the other employees Plaintiff claims Defendant terminated without an objective basis – Racko, Stovash, and Krakowiak – are all white, further undermining Plaintiff's racial discrimination claim.[17]

In sum, Plaintiff simply has failed to demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its action that a reasonable factfinder could rationally find

---

[16]  Plaintiff also asserts that Defendant does not have a policy or procedure for determining when to issue an oral disciplinary consultation or a written warning, or for determining how many written warnings to which an employee is entitled.  Pl. Opp. at 8.

[17]  Plaintiff's argument (contained in a footnote) that Defendant's reason is pretext because it used unreliable attendance records is similarly deficient.  Plaintiff specifically argues that Defendant's time records are unreliable because the time contained therein often differs from time recorded on annual performance reviews.  Pl. Opp. at 9 n.2.  Again, however, the records Plaintiff cites as examples are primarily those of white employees.  Thus, this alleged discrepancy does not suggest race discrimination.  The fact that Defendant's original records are unavailable for inspection is likewise immaterial.  See Harding v. Careerbuilder, LLC, 168 F. App'x 535, 539 (3d Cir. 2006) ("Evidence of lapses in the employer's record-keeping cannot on its own establish a pretext claim.").

them unworthy of credence.  Plaintiff likewise has failed to offer any evidence from which a reasonable jury could conclude that his race was more likely than not a motivating or determinative cause of his discharge.  Accordingly, Defendant's motion for summary judgment as to Plaintiff's race discrimination claims is granted.

    4.  <u>Disability Discrimination Under the ADA and PHRA (Counts III, IV)</u>

       The ADA prohibits a covered employer from discriminating against a qualified individual with a disability because of that disability in regard to the terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a).  In order to establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must prove that:  (1) he has a "disability" within the meaning of the Act; (2) he is a "otherwise qualified" to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he has suffered an adverse employment action.  <u>Williams v. Philadelphia Hous. Auth. Police Dep't</u>, 380 F.3d 751, 761 (3d Cir. 2004).  Defendant argues that Plaintiff cannot satisfy the first element of the *prima facie* case.    Under the ADA, an "individual with a disability" is any person who:

        (i)    has a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

        (ii)   has a record of such an impairment; or

        (iii)  is regarded as having such an impairment.

42 U.S.C. § 12102(2).  Although Plaintiff purports to proceed under all three bases in his Amended Complaint, he argues in his brief in opposition only that Defendant

26

regarded him as disabled within the meaning of the third subsection of the definition. Because Plaintiff has not provided any argument or evidence regarding the first two definitions of disability, I consider only his "regarded as" claim here. See Kelly v. Drexel Univ., 907 F. Supp. 864, 878 (E.D. Pa. 1995) (where plaintiff did not address an issue of discrimination raised in the complaint, defendants were entitled to summary judgment), aff'd, 94 F.3d 102 (3d Cir. 1996).   To prevail under a "regarded as" theory, Plaintiff must demonstrate either that (1) despite having no impairment at all, his employer erroneously believes he has an impairment that substantially limits a major life activity or (2) he has a nonlimiting impairment that the employer mistakenly believes substantially limits a major life activity. Tice v. Centre Area Transp. Auth., 247 F.3d 506, 514 (3d Cir. 2001). In either case, it is not sufficient to show that Defendant regarded Plaintiff as having an impairment; rather, Defendant must have regarded Plaintiff as having a substantially limiting impairment. See id. In all cases, the court should consider the information the employer had regarding the plaintiff's condition and the employer's response to that information.

The term "substantial" in the phrase "substantially limits" "clearly precludes impairments that interfere in only a minor way with performance of [a major life activity] from qualifying as disabilities." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002); see also Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 565 (1999) (a "mere difference" does not amount to a "significant restric[tion]" on a major life activity). "Major life activities" are those basic activities that the average person can

perform with little or no difficulty such as walking, seeing, hearing, speaking, breathing, sitting, standing, reaching, learning, and working.  29 C.F.R. § 1630.2(i).  Congressional intent dictates that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." Toyota Motor Mfg., 534 U.S. at 197.  Therefore, to be substantially limited in a major life activity:

> an individual must have an impairment that prevents or
> severely restricts the individual from doing activities that
> are of central importance to most people's daily lives.  The
> impairment's impact must also be permanent or long-
> term.

Id. at 198 (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii)).

The "essence" of the "substantial limitation" inquiry "regards comparing the conditions, manner, or duration under which the average person in the general population can perform the major life activity at issue with those under which an impaired plaintiff must perform." Emory v. AstraZeneca Pharms. LP, 401 F.3d 174, 179-80 (3d Cir. 2005); see also 29 C.F.R. § 1630.2(j)(1).  In making this determination, courts should consider the nature and severity, the duration or expected duration, and the long-term impact or expected long-term impact of the impairment. Emory, 401 F.3d at 180 (citing 29 C.F.R. § 1630.2(j)(2)).  "An employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment . . . are preferable to others, just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job." Sutton v. United Air Lines Inc., 527 U.S. 471, 490-91 (1999).

Here, Plaintiff contends that Defendant impermissibly regarded him as having

an impairment that substantially limited the major life activity of working.  Pl.'s Opp. at 11.  To avoid summary judgment, Plaintiff must show some evidence supporting a rational inference that Defendant perceived him as having an impairment that significantly restricted his ability "to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities."  29 C.F.R. § 1630.2(j)(3)(i).  Simply showing that Defendant perceived him as unable to perform one particular job is not enough. Murphy v. UPS, 527 U.S. 516, 523 (1999); Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 188 (3d Cir. 1999); Grabosky v. Tammac Corp., 127 F. Supp. 2d 610, 616 (M.D. Pa. 2000).

I find that the record evidence demonstrates that there is a genuine issue of material fact on this question.  For example, Stringi, testifying as Defendant's 30(b)(6) witness, stated that he decided to terminate Plaintiff's employment for unreliability due to his attendance problems.  Those attendance issues included numerous medical absences related to Plaintiff's colon cancer and related conditions.  I also find it noteworthy that although Plaintiff had been warned about absenteeism and tardiness issues throughout his career, Defendant did not discharge him until after his long absence due to his cancer and several related medical absences and tardiness incidents following his return to work.  Plaintiff also has pointed to documentary evidence (performance recognitions, file memos, etc.) expressing concern about Plaintiff's health-related absences.  Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant regarded him as having an impairment that foreclosed his ability to regularly and

29

reliably attend work – a restriction that would preclude success in almost any position or class of jobs.  See, e.g., Young v. Bank of Boston Conn., Civil No. 3:93CV1642 (AVC), 1995 WL 908616, at *6 (D. Conn. Mar. 31, 1995).

Defendant argues that it could not have regarded Plaintiff as unable to work because it reinstated Plaintiff to his former position without restrictions following his return from cancer treatment in early-2004, and Plaintiff remained employed in that position until his discharge over ten months later in March 2005.  Although this point may be relevant to a jury, it is not dispositive.  Significantly, the fact remains that Defendant's own reasons for determining Plaintiff to be unreliable do not focus solely on the last ten months of his employment but hearken back to his prior history of attendance problems including, when the facts are viewed in the light most favorable to Plaintiff, Plaintiff's lengthy time off for his colon cancer and related treatment.  Thus, issues of fact remain whether, in March 2005, Defendant perceived Plaintiff as having an impairment that foreclosed his ability to regularly and reliably attend work and whether Defendant terminated Plaintiff's employment because of that perception.  Accordingly, Defendant's Motion for Summary Judgment on this claim is denied.

5. Violation of FMLA (Count V)

Congress enacted the FMLA "to balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons."  29 U.S.C. § 2601(b)(1), (2).  The FMLA seeks to achieve these purposes "in a manner that accommodates the legitimate interests of employers."

Id. § 2601(b)(3).

An employee is eligible for FMLA leave if he (1) has been employed by the employer for at least one year and (2) has worked at least 1,250 hours in the twelve months immediately preceding the leave. Id. § 2611(2). Eligible employees may take up to twelve work weeks of leave within a twelve-month period if, inter alia, the employee suffers from "a serious health condition that makes the employee unable to perform the functions of the position of such employee." Id. § 2612(a)(1)(D). Following a qualified FMLA leave, an employee has the right to be restored to his former position or an equivalent position. Id. §§ 2612, 2614; 29 C.F.R. § 825.214(a). An employer need not restore the employment if the employee "is unable to perform an essential function of the position because of a physical or mental condition . . . ." 29 C.F.R. § 825.214(b). Moreover, a restored employee is not entitled to any rights, benefits, or positions to which the employee would not "have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). Thus, "if an employee is discharged during or at the end of a protected leave for a reason unrelated to the leave, there is no right to reinstatement." Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004).

There are two relatively distinct causes of action under the FMLA. First, the FMLA's "interference" provisions declare it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the FMLA. 29 U.S.C. § 2615(a)(1). Second, the statute prohibits an employer from discriminating or retaliating against an employee for exercising such

rights. Id. § 2615(a).  In this regard, the regulations implementing the FMLA provide:

> An employer is prohibited from discriminating against employees . . . who have used FMLA leave.  For example, . . . employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions; nor can FMLA be counted under "no fault" attendance policies.

29 C.F.R. § 825.220(c); see also Conoshenti, 364 F.3d at 147 n.9.  Thus, an employer who interferes with an employee's exercise of rights, or retaliates against an employee for the exercise of the same, violates the FMLA and may be subject to civil liability for such violations.   29 U.S.C. §§ 2615(a), 2617(a); see also Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005); Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 570-72 (M.D. Pa. 2004); Grimes v. Dollar Gen. Corp., No. Civ. A. 04-1492, 2006 WL 519486, at *3 (W.D. Pa. Mar. 1, 2006).

In this case, Plaintiff asserts only an FMLA retaliation claim. Specifically, Plaintiff argues that Defendant used his taking of FMLA leave in 2003 as a negative factor in deciding to terminate his employment.  Both parties have moved for summary judgment as to this claim.

To be successful on an FMLA retaliatory discharge claim, a plaintiff must demonstrate that: (1) he is protected under the FMLA; (2) he suffered an adverse employment action (i.e., termination); and (3) that a causal connection exists between the adverse employment action and the plaintiff's exercise of his rights under the FMLA.  Conoshenti, 364 F.3d at 146; Grimes, 2006 WL 519486, at *4; Baltuskonis v. U.S. Airways, Inc., 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999).  In analyzing retaliation claims under the FMLA, courts look to the legal framework established for

Title VII claims.  Grimes, 2006 WL 519486, at *4.  Thus, a plaintiff may prove retaliation by direct evidence as set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 244-46 (1989), or indirectly through the McDonnell Douglas burden-shifting analysis.

Here, Defendant argues that Plaintiff cannot establish a causal connection between Plaintiff's discharge and his taking of FMLA leave and, therefore, Defendant is entitled to the entry of summary judgment in its favor on Plaintiff's FMLA claim. Plaintiff opposes Defendant's position and argues instead that summary judgment in his favor is appropriate because there is conclusive direct evidence that Defendant used his FMLA-protected leave as a negative factor in deciding to terminate his employment.

Under the Price Waterhouse framework, when a plaintiff "alleging unlawful termination presents 'direct evidence' that his [FMLA leave] was a substantial factor in the decision to fire him, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered [the FMLA leave]."  Conoshenti, 364 F.3d at 147 (alterations in original) (citations and internal quotations omitted).  The employer then must:

> convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor.  The employer need not isolate the sole cause for the decision; rather it must demonstrate that with the illegitimate factor removed from the calculus, sufficient business reasons would have induced it to take the same employment action.  This evidentiary scheme essentially requires the employer to place the employee in the same position he or she would have occupied absent discrimination.

Id. at 147-48 (quoting Price Waterhouse, 490 U.S. at 276-77).  "Direct evidence" is

"evidence sufficient to allow the jury to find that the decisionmakers placed substantial negative reliance on [the protected activity] in reaching their decision to fire him." Id. at 147 n.10 (internal quotations and citations omitted).

Here, Plaintiff points to Stringi's deposition testimony regarding the absences he took into account in deciding to terminate Plaintiff's employment as direct evidence that his FMLA-protected leave was a negative factor in that decision. For purposed of the summary judgment analysis, I agree. In particular, Stringi has maintained that Plaintiff was terminated because of his poor attendance and reliability problems throughout his career with Defendant. Stringi Dep. at 97; Stringi Aff. ¶ 11. During his deposition as Defendant's 30(b)(6) witness, Stringi specifically admitted that the absences he considered in making this decision included, inter alia, Plaintiff's absences in 2003 for his blood clot and his colon cancer, and their associated surgeries and recoveries. Stringi Dep. at 101-02. Defendant does not credibly dispute that at least twelve weeks of this leave was FMLA-protected. This evidence is similar to that in Conoshenti, which consisted of several documents demonstrating that the plaintiff in that case was terminated for all 92 days of his absence from work after a car accident, twelve weeks of which was FMLA-protected leave. 364 F.2d at 147. The Conoshenti court concluded that these documents were sufficient "direct evidence" of the plaintiff's leave having been a substantial factor in the discharge decision to give the plaintiff the benefit of the Price Waterhouse analysis. Id. at 147-48. I find that Stringi's testimony is unequivocal and, like the documents in Conoshenti, is sufficient to allow a reasonable jury to find that the

decisionmakers placed substantial negative reliance on Plaintiff's FMLA-protected absences in reaching their decision.

Defendant denies that Stringi's deposition testimony is evidence of causation at all, let alone direct evidence within the meaning of Price Waterhouse. Specifically, Defendant argues that when read in context, Stringi's testimony conveys only that Plaintiff "was terminated for his entire record of attendance and reliability over the course of his career at MetalTech, not because he took alleged protected leave." Def.'s Opp. Br. at 5-6. Defendant continues that Stringi was merely explaining Plaintiff's career-long attendance and reliability issues and "did not mean to insinuate" that Plaintiff's leave of absence for colon cancer treatment was a negative factor in the decision to discharge Plaintiff. Id. This argument is unpersuasive. As set forth above, Plaintiff's counsel specifically asked Stringi if Plaintiff was terminated at least in part for his time on salary continuance related to his blood clot and/or colon cancer and Stringi unequivocally answered "yes."

Defendant further argues not only that there is no direct evidence that Plaintiff's FMLA leave was a factor in its decision to terminate his employment, but also that there is no evidence of causation at all because ten months passed between Plaintiff's return to work from his colon cancer and his discharge and because Defendant expressed concerns about Plaintiff's attendance and reliability well before his alleged protected leave. Def.'s Opp. Br. at 3.[18]  This argument is

[18]  Defendant argues that this is at most a circumstantial evidence case and, thus, that McDonnell Douglas burden-shifting analysis rather than Price Waterhouse should apply. For the reasons set forth herein, I disagree. Even if a McDonnell-Douglas analysis were appropriate, the record evidence is sufficient in this case to create a genuine issue of material fact for the jury as to

unavailing.  If anything, the timing in this case favors Plaintiff.  Although a ten-month gap between protected leave and an adverse employment action may negate an inference of causation in some cases, here Defendant's own articulated reason for discharging Plaintiff relates primarily to Plaintiff's attendance record prior to the final ten months of his employment, including, by Stringi's account, the period including Plaintiff's protected leave.  The fact that Defendant warned Plaintiff about attendance issues in the past is likewise unpersuasive.  Indeed, a reasonable jury could view the fact that Defendant did not terminate Plaintiff despite his numerous attendance problems until after his colon cancer and related protected leave entered the picture, as evidence supporting Plaintiff's claim.[19]

Because Plaintiff has offered direct evidence that FMLA-protected leave was a negative factor in his discharge, the burden shifts to Defendant to show that it would have reached the same decision even with the FMLA leave removed from the equation.  Conoshenti, 364 F.3d at 147-48.  Based on the record evidence including, inter alia, that Plaintiff had numerous attendance issues extending beyond his FMLA leave, I find that this is a material issue of fact for the jury to decide.

Plaintiff argues that Stringi's admission that he took FMLA-protected leave

---

FMLA liability under that framework.

[19]   Defendant also points to the fact that Plaintiff "did not suffer any adverse employment action" and was promoted after taking protected leave in 2000 for stomach-related health issues as evidence that FMLA leave did not factor into its 2005 termination decision.  Def.'s Opp. Br. at 6.  I disagree.  Although Plaintiff may not have been discharged or disciplined immediately following his 2000 medical leave, Stringi's deposition testimony is evidence that the 2000 leave was part of Plaintiff's attendance record that was considered in deciding to terminate his employment in 2005. Whether Defendant would have made the same decision absent this leave remains a material issue for the jury.

time into account in deciding to terminate Plaintiff's employment is conclusive evidence of FMLA retaliation and, thus, mandates summary judgment in Plaintiff's favor on his FMLA claim.  I disagree.  As set forth above, the record evidence at most shifts the burden to Defendant to prove that it would have discharged Plaintiff even if it had not taken into account his FMLA-protected leave.  There is no support in Third Circuit caselaw for denying Defendant this opportunity.

As set forth above, in Conoshenti, the court of appeals affirmed the use of the Price Waterhouse burden-shifting approach in analyzing a direct evidence claim. Plaintiff's argument that this case is different because the evidence here is "conclusive" of a violation, while that in Conoshenti was not, is unpersuasive.  In Conoshenti, the employer admitted firing the plaintiff for taking 92 days of leave, 12 weeks of which was FMLA-protected.  Here, Plaintiff's leave for his colon cancer and recovery far exceeded 92 days.  Thus, I fail to see how Plaintiff's evidence is more "conclusive" than that in Conoshenti.

Plaintiff's argument that Defendant is not entitled to the benefit of the shifting burden of persuasion under Price Waterhouse because it has admitted that Plaintiff's FMLA leave was a "negative factor" in its decision is also unpersuasive. Plaintiff cites Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1125 (9th Cir. 2001), in support of this proposition.  The Court of Appeals for the Ninth Circuit in Bachelder held that to prevail on a retaliatory discharge claim under 29 C.F.R. § 825.220(c), a plaintiff need only prove that his or her taking of FMLA leave constituted a "negative factor," as opposed to a determinative factor, in the

termination decision.  259 F.3d at 1124.  This portion of <u>Bachelder</u>, however, is not the law in the Third Circuit.   Rather, the <u>Conoshenti</u> court expressly permitted burden shifting in a direct evidence FMLA case and did not consider whether the reference in section 825.220(c) to a "negative factor" makes it unnecessary for a plaintiff to prove but-for causation in FMLA retaliatory-discharge cases unaffected by <u>Price Waterhouse</u>.  364 F.3d 147 & n.10 (citing <u>Bachelder</u>).

Further analysis of the language in <u>Conoshenti</u> suggests that the court would not agree that a plaintiff could prevail in a retaliatory discharge case even where the evidence would permit a reasonable jury to conclude that the employer would have made the same decision absent consideration of the protected leave.  For example, although the <u>Conoshenti</u> court considered 29 C.F.R. § 825.220(c) as an implementation of the FMLA's "interference" provisions, it noted that the text of the regulation "unambiguously speaks in terms of 'discrimination' and 'retaliation,' and we shall, of course, apply it in a manner consistent with that text."  364 F.3d at 147 n.9.  Moreover, to hold an employer liable under the FMLA for retaliatory discharge where the employer would have reached the same decision absent the protected leave, would contravene the plain language of the statute that a restored employee is not entitled to any rights, benefits, or positions to which the employee would not "have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3)(B).

In short, the question before me is whether Defendant would have terminated Plaintiff's employment even absent consideration of his FMLA-protected leave.  After reviewing both parties' arguments, I find that the evidence of record,

when viewed in the light most favorable to the nonmoving party (be it Plaintiff or Defendant), creates genuine issues of material fact that preclude summary judgment.  Thus, both parties' motions for summary judgment on the FMLA claim are denied.[20]

IV.  CONCLUSION

For all of these reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part, and Plaintiff's Motion for Summary Judgment is denied.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORDER OF COURT

AND NOW, this  **3rd** day of May, 2007, after careful consideration of the submissions of the parties and for the reasons set forth in the Opinion accompanying this Order, it is ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 27) is DENIED.  It is ORDERED that Defendant's Motion for Summary Judgment (Docket No. 31) is GRANTED with respect to Plaintiff's claims for: race discrimination in violation of Title VII of the Civil Rights Act of 1964 and/or the Pennsylvania Human Relations Act ("PHRA"); and age discrimination in violation of the Age Discrimination in Employment Act and/or PHRA set forth in Counts I, II, and IV of Plaintiff's Amended Complaint (Docket No. 24).  Defendant's Motion for Summary

---

[20]  Plaintiff also argues he is entitled to summary judgment in his favor on the issue of liquidated damages under the FMLA.  Because I find a genuine issue of material fact as to FMLA liability, Plaintiff's Motion for Summary Judgment on damages is also denied.

39

Judgment also is GRANTED with respect to Plaintiff's claim that he had an "actual disability" or a "record of a disability" within the meaning of the Americans with Disabilities Act and/or PHRA.  Defendant's Motion is DENIED in all other respects.

It is also ORDERED that counsel attend a pretrial/settlement conference scheduled for May 14, 2007 at 10:30  A.M. before the undersigned in Room 3280, Third Floor of the U.S. Post Office & Courthouse, 700 Grant Street, Pittsburgh, Pennsylvania.  Counsel shall have settlement authority, and parties are to be either present or available by telephone.  In addition, counsel are to fax their position letters three (3) days prior to the conference.


BY THE COURT:




/S/   Donetta W. Ambrose

 Donetta W. Ambrose,
 Chief U. S. District Judge